1  **WO**                                                                        JDN

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9  Joseph A. Trenton,                    )    No. CV 04-2548-PHX-MHM (DKD)
                                         )
10            Plaintiff,                  )    **ORDER**
                                         )
11  vs.                                   )
                                         )
12  Arizona Department of Corrections, et al.,)
                                         )
13            Defendants.                 )
                                         )
14  _____     )

15        Plaintiff Joseph A. Trenton brought this civil rights actions under 42 U.S.C. § 1983

16  against the following Defendants:  (1) Dora Schriro, Director of the Arizona Department of

17  Corrections (ADC); (2) Deputy Warden Klein; (3) Captain Carroll; and (4) Sergeant Massey

18  (formally "Carlin")[1] (Defendants) (Doc. #9).[2]  Before the Court are Defendants' Motion for

19  Summary Judgment (Doc. #158), Plaintiff's Rule 56(d) Motion (Doc. #169),[3] and Plaintiff's

20  Motion to Strike (Doc. #178).

21        The Court will deny Plaintiff's motions and grant in part and deny in part Defendants'

22

23  _____

24       [1]Carlin has changed her last name to Massey, and Defendants request that the docket
be changed to reflect the correct name (Doc. #158 at 1 n. 1).  The request will be granted and
25  the docket will be changed accordingly.

26       [2]The Court dismissed Deputy Warden Schweitzer as a Defendant (Doc. #126).

27       [3]Plaintiff's Rule 56(d) Motion is combined with his Response to Defendants' Motion
for Summary Judgment (Doc. #170), but the Motion has been docketed separately at
28  Document #169.

Motion for Summary Judgment.

**I.     Background**

Plaintiff's claims arose during his confinement in the Arizona State Prison (Doc. #9). Plaintiff set forth seven counts in his First Amended Complaint; three of those counts remain.[4]   In Count I, Plaintiff alleged that in July 2003, he was placed in cellblock 6 (CB6)—a maximum security facility—for 5 weeks in retaliation for filing grievances (id. at 4).   He asserted that he was a low-security inmate who should not have been placed in CB6 without notice and the "2-A" investigation process provided for under ADC policy (id.).   In Count III, Plaintiff alleged that in May 2004, Schriro, Klein, and Massey threatened his safety when they placed him in a small shower cell without bedding or a toilet for 3 days (id. at 6-6B).   And in Count VI, Plaintiff claimed that Schriro, Carroll, and Massey violated his due process rights during disciplinary proceedings stemming in part from the incident described in Count III (id. at 9-9A).   Plaintiff sued for damages and declaratory and injunctive relief (id. at 11-11B).

Defendants now move for summary judgment on the grounds that (1) Schriro was not involved in Plaintiff's CB6 placement and did not violate his rights, (2) Plaintiff's temporary placement in the shower room did not implicate the Eighth Amendment, (3) Klein and Massey are entitled to qualified immunity, and (4) Plaintiff received due process at his disciplinary hearings (Doc. #158).

With their motion, Defendants proffer a separate Statement of Facts (DSOF) (Doc. #159), which is supported by the affidavit of Diann Staymates, Human Resources Administrator (id., Ex. A); the declarations of Correctional Officer (CO) IV Grace Woolsey (id., Ex. B), and CO III S. Perow (id., Ex. C); the affidavit of Mary Ellen Massey (id., Ex. D); the declarations of James Klein (id., Ex. E), and L. Carroll (id.,Ex. F); excerpts from

---

[4]Plaintiff moved to dismiss Counts II, V, and VII (Doc. #104); the Court granted Plaintiff's request (Doc. #110).  The Court subsequently dismissed Count IV for failure to exhaust administrative remedies (Doc. #126).

Plaintiff's deposition (id., Ex. G), and a copy of the docket from another of Plaintiff's cases in this district (id., Ex. H). There are various attachments submitted with the affidavits and declarations (id., Exs. A-F, Attachs.).

The Court issued an Order informing Plaintiff of his obligation to respond to the motion (Doc. #160).[5]  In response, Plaintiff contends that Defendants have failed to meet their burden to show the absence of a material factual dispute on any of his claims (Doc. #170).  He argues that Defendants' Motion lacks merit and is unsupported by legal precedent (id. at 1).  And Plaintiff asserts that Defendants violated rights that were clearly established (id.).

In support of his opposition, Plaintiff submits a Memorandum of Law (Doc. #172) and a separate Statement of Facts (PSOF) (Doc. #171), which is supported by his own declaration (id., Ex. A) and various attachments, including sworn statements from Plaintiff's mother and another prisoner; copies of grievances, medical records, and handouts; and copies of communication between Plaintiff and defense counsel and other attorneys (id., Exs. 1-64).

Along with his response, Plaintiff moves under Federal Rule of Civil Procedure 56(d) for the Court to issue a finding of facts as to the material undisputed facts in this action (Doc. #169).  Plaintiff identifies what he submits are the established undisputed facts (id. at 2-3).

In reply, Defendants argue that Plaintiff's contentions are not supported by either the facts or applicable case law (Doc. #174).  They also oppose Plaintiff's Rule 56(d) Motion on the grounds that is it premature at this stage to issue a findings of fact (Doc. #177).  Defendants also submit objections to PSOF and a supplemental Statement of Facts in response to PSOF, to which they attach additional documentary evidence (Doc. #175, Ex. 1).  Defendants request that the Court consider these documents despite the failure to submit them with their Motion, and they indicate that they would not object to Plaintiff responding to this evidence (id. at 5).

---

[5]Notice required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998).

Plaintiff moves to strike Defendants' supplemental Statement of Facts on the grounds that there is no foundation for Defendants' objections and arguments, they are unsubstantiated and conclusory, and the Federal Rules of Civil Procedure do not provide for supplemental filings (Doc. #178). Defendants respond to Plaintiff's Motion to Strike and argue that it is an impermissible surreply to Defendants' Motion for Summary Judgment (Doc. #179). They contend that since Plaintiff did not seek leave to file a surreply, his Motion to Strike should be stricken (id.). And Plaintiff replies in support of his Motion to Strike (Doc. #180). He argues that Defendants' response is not supported with any case law or facts that would prevent the Court from considering his Motion (id.).

## II.    Facts

In their respective Statements of Facts, the parties set forth the following undisputed and disputed facts as to each of Plaintiff three claims.

### A.    Count I—Retaliatory Placement in CB6

On June 17, 2003, Plaintiff was transferred from Texas to ADC and placed at the CB6 unit of the Arizona State Prison Complex (ASPC)-Florence, which is a super-max facility (DSOF ¶ 6; PSOF ¶ 6). The parties dispute why Plaintiff was placed in this unit, and Defendants concede that there is no documentation reflecting why Plaintiff was assigned to CB6 (DSOF ¶ 7). They suggest it may have been due to Plaintiff's behavior at the Texas facility, which they assert warranted administrative review and possibly disciplinary proceedings (id.). But there were no disciplinary proceedings upon Plaintiff's arrival at CB6 (id. ¶ 8).

CB6 is a level-5 unit, which is the highest custody level (DSOF ¶ 14). Defendants submit that it is a "transitory" facility where inmates are often housed for short intervals pending reclassification or placement decisions upon arrival from other facilities (id.). On July 2, Plaintiff received an administrative review at which time the Institutional Classification Committee (ICC) reviewed Plaintiff's Do Not House With (DNHW) list and

recommended placement at ASPC-Safford-Tonto Unit (DSOF ¶¶ 17-18). Defendants state that the reason for the administrative review was Plaintiff's return from Texas (id. ¶ 18). Plaintiff states that he was never told that his reclassification was due to his return from Texas (PSOF ¶ 18). He states that the administrative review came after he submitted an inmate letter complaining that his placement in CB6 was retaliatory (id.).

On July 9, Plaintiff filed another inmate letter complaining about his placement at CB6 and expressing concerns about placement at the Safford-Tonto Unit due to protective segregation issues (DSOF ¶ 20; PSOF ¶ 20). Plaintiff was informed that placement was not a grievable issue and that his placement at Safford was not yet approved (DSOF ¶ 21; PSOF ¶ 21). The following day, however, Central Office approved Plaintiff's classification and the Safford placement (DSOF ¶ 22; PSOF ¶ 22). That same day, July 10, Plaintiff submitted an inmate grievance about his placement at CB6 (DSOF ¶ 23; PSOF ¶ 23). On July 15, Plaintiff's grievance was returned to him as "unprocessed" for failure to follow policy, which requires that a copy of the inmate letter (that initiated the grievance process) be attached to the inmate grievance (DSOF ¶ 24). Plaintiff submitted the grievance without an inmate letter because at that time, the inmate letters did not include carbon copies and his original inmate letter was filed and then lost (PSOF ¶¶ 24, 18).

On July 17, Plaintiff resubmitted his grievance and attached a copy of the July 9 inmate letter response (DSOF ¶ 25; PSOF ¶ 25). Then, on July 25, Plaintiff was moved to the Safford-Tonto Unit (DSOF ¶ 26: PSOF ¶ 26). Defendants state that on or about August 5, CO III Stracco responded to the July 17 grievance and informed Plaintiff that he was put in CB6 due to reports of unauthorized conduct while housed in Texas, but because he has now been moved, his grievance was moot (DSOF ¶ 27). Plaintiff states that he never received a response to his July 17 grievance, and when he appealed his grievance he wrote that he did not receive a response and the subsequent appeal response from the deputy warden did not mention a response from the CO III (PSOF ¶ 27).

On August 20, Plaintiff filed an inmate grievance appeal—about his placement at CB6 upon his return from Texas—to the Warden (DSOF ¶ 30; PSOF ¶ 30). The Assistant Deputy Warden, Bruce Shiflet, responded to the appeal by denying it and informing Plaintiff that he could not grieve placement or classification (DSOF ¶ 32; PSOF ¶ 32). And on November 6, Plaintiff was assigned to ASPC-Lewis (DSOF ¶ 33; PSOF ¶ 33).

**B.    Count II—Placement in Shower Room**

In May 2004, Plaintiff was housed at the Bachman Detention Unit at the ASPC-Lewis facility; this unit was operating at maximum capacity at the time, and often, inmates were triple-bunked in cells designed for two inmates (DSOF ¶ 36; PSOF ¶ 36). On May 26, Plaintiff was ordered to house in cell A-09 with an inmate named Gholston (PSOF ¶ 37). Plaintiff informed staff that he could not house with Gholston because Gholston had previously attacked Plaintiff, this attack was documented in Plaintiff's file, and Gholston had been issued a disciplinary ticket for the attack (id.). Defendants state that Gholston was not on Plaintiff's DNHW list (DSOF ¶ 39). Plaintiff states that Gholston also told staff that they could not house together (PSOF ¶ 37). Defendants state that Plaintiff told staff he had previously assaulted Gholston (DSOF ¶ 38). A third inmate—Johnson—was also ordered to house in cell A-09 with Gholston and Plaintiff, and Defendants state that Johnson told them that he, too, previously assaulted Gholston and could not be housed with him (DSOF ¶ 38). Massey was summoned (DSOF ¶ 40).

The parties' versions vary greatly as to what happened next. Defendants state that Plaintiff, Johnson, and Gholston were all escorted to cell A-09 and agreed to remain there (DSOF ¶ 40). But about 15 minutes later, Massey was called back to the area because Plaintiff said he refused to live with Gholston and that if one of them was not removed, he would attack Gholston (id. ¶¶ 41-42). Defendants state that Massey confirmed that Gholston was not on Plaintiff's DNHW list (id. ¶ 43). Defendants state that Plaintiff and Johnson refused to exit cell A-09, so both were put in restraints until Klein arrived with instructions

(id. ¶ 51).  When Klein arrived, he directed Plaintiff and Johnson to exit the cell, and they complied (id. ¶ 52).  At Klein's direction, Massey escorted Plaintiff to a shower room in the detention unit (id. ¶ 54).  Defendants state that they were "advised" that Plaintiff was offered fresh bedding and a mattress but he declined them for unknown reasons (id.).

Plaintiff states that when Massey first arrived, he explained to her that Gholston had attacked him (PSOF ¶ 39).  Plaintiff states that Massey left and then returned with a large can of pepper-spray and told Plaintiff to house with Gholston or get sprayed (id.).  Plaintiff states that Massey claimed to have checked the DNHW list and it did not list Gholston, so she said Plaintiff would get no more warnings before she sprayed (PSOF ¶ 39).  Plaintiff states that out of fear, he housed with Gholston (id.).  Plaintiff states when they were put into cell A-09, he and Johnson were placed in restraints but Gholston was not (PSOF ¶ 40).  Plaintiff states that tension was high, so he began to kick the cell door; Massey came in and Johnson screamed at Massey about the cell assignment; Plaintiff again told Massey he could not house with Gholston; Massey told Plaintiff to "just deal with it" (id. ¶ 41).  Plaintiff states that he never threatened Gholston, but Johnson did (id. ¶ 42).  Plaintiff states that he was then attacked from behind by Gholston as guards looked on (id. ¶ 45).  Plaintiff states that Klein arrived and ordered Plaintiff to exit the cell, which he did (id. ¶ 52).  Plaintiff states that once in the shower room, he was not offered bedding or a mattress; when he asked where he was to sleep, he states that Klein told him to "figure it out, it was not his problem" (id. ¶ 54).

Defendants state that Massey did not see any physical altercation between Plaintiff and Gholston (DSOF ¶ 53).  Defendants state that Massey directed ADC staff to provide water for Plaintiff and allow him to use the toilet during hourly security checks and to document these checks (id. ¶ 55).  Plaintiff states that he was not allowed to use the toilet nor was he given water, despite his requests for both (PSOF ¶ 55).  Plaintiff was served his meals in this shower room (DSOF ¶ 56; PSOF ¶ 56).  Plaintiff states that the shower was flooded when he was put there and the conditions were filthy (PSOF ¶ 64).  He states that he had to

relieve himself in the shower and then eat his food near his own waste (id. ¶ 79).

Plaintiff avers that while he was housed in the shower, he became very ill, used the drain to vomit in, and then passed-out when he tried to stand up (Doc. #171, Ex. A, Pl. Decl. ¶ 19). When he fell, he hit his head on a protruding spike on the wall and lost consciousness (id.). The staff initiated an IMS and medical staff responded.[6] Plaintiff was left in the shower after this incident (id.).

Plaintiff remained in the shower for a total of three days (PSOF ¶ 85). Meanwhile, Massey issued a disciplinary ticket to Plaintiff for refusing a direct order to house with Gholston (DSOF ¶ 62; DSOF ¶ 63).

## C.   Count III—Disciplinary Proceedings

On May 26, after Plaintiff was issued a major disciplinary ticket for refusing to house with Gholston, he was placed on disciplinary report (DSOF ¶¶ 89-90). Plaintiff states that he was actually issued two disciplinary tickets: one for refusing to house with Gholston and a second for refusing to house in the shower (PSOF ¶ 89). On June 1, Plaintiff was transferred to the East Unit at ASPC-Florence (DSOF ¶ 93; PSOF ¶ 93). On June 4, the unit disciplinary coordinator requested a 30-day extension for the disciplinary hearing on the two tickets; that request was approved by Klein (DSOF ¶ 92).

Then, on June 18, the East Unit disciplinary coordinator, Curran, served Plaintiff with notice of a June 22 hearing date (DSOF ¶ 94; PSOF ¶ 94). Plaintiff states that this notice reflected that the charges against him were changed from refusal to house with Gholston to "refusal to exit cell A-09" and from refusal to house in shower to "threatening a person with harm" (PSOF ¶ 94). Defendants state that Plaintiff was offered staff assistance, but declined (DSOF ¶ 94). Plaintiff states that he requested staff assistance as well as physical evidence, but his requests were denied (PSOF ¶ 95). Defendants state that Plaintiff requested one

---

[6]"IMS" refers to Inmate Management System, which is initiated for different kinds of emergencies (medical, security, etc.).

witness—CO IV Scott (DSOF ¶ 95). Plaintiff states that he also requested two inmate witnesses—Johnson and Gholston—but his request was denied (PSOF ¶ 94).

On July 4, Curran requested a second postponement until July 30; the request was approved by the deputy warden (DSOF ¶ 96). On July 22, Carroll convened Plaintiff's disciplinary hearing (DSOF ¶ 99; PSOF ¶ 99). Plaintiff pled not guilty; Carroll denied Plaintiff's requested witness, CO IV Scott; Plaintiff made a statement; and Carroll found Plaintiff guilty of the charge (DSOF ¶¶ 99, 101). Plaintiff was assessed 10 days in disciplinary detention, 60-day placement in parole class III, 40 hours extra duty, 30-day loss of privileges, and referred for reclassification (id. ¶ 101). Plaintiff refused to sign the disciplinary hearing result form (DSOF ¶ 102; PSOF ¶ 102). Plaintiff appealed Carroll's guilty finding (DSOF ¶ 104; PSOF ¶ 104), and Assistant Deputy Warden Orthmann upheld the guilty finding on July 28 (DSOF ¶ 105; PSOF ¶ 105). Plaintiff appealed to the ADC Director (DSOF ¶ 106; PSOF ¶ 106), and the Central Office upheld the guilty finding (DSOF ¶ 107; PSOF ¶ 107).

It appears that this first disciplinary hearing concerned only the first charge against Plaintiff (refusal to exist cell A-09) because Defendants state that a second disciplinary hearing was set for June 22 on the second disciplinary ticket—threatening a person (in this case Gholston) with harm (DSOF ¶¶ 108, 113). Defendants state that on June 18, when Plaintiff was served notice of the June 22 hearing, he declined staff assistance and requested no witnesses (DSOF ¶¶ 113-114). Plaintiff states that he requested staff assistance, that inmates Johnson and Gholston be called as witnesses, and that he get physical evidence; those requests were all denied (PSOF ¶¶ 113-114).

No hearing was held on June 22; instead, on July 4, the East Unit disciplinary coordinator requested a postponement, which was approved by Orthmann (DSOF ¶ 115). The disciplinary coordinator completed her investigation, the case was referred to Carroll, and the charge was designated as a major rule violation (DSOF ¶ 116; PSOF ¶ 116). Carroll

convened the disciplinary hearing on July 22; Defendants state that Plaintiff pled not guilty and made no statement (DSOF ¶ 117).  Carroll found Plaintiff guilty of the charge (DSOF ¶ 119; PSOF ¶ 119), and Plaintiff signed the disciplinary result form (DSOF ¶ 120; PSOF ¶ 120).  Plaintiff appealed the guilty finding through to the ADC Director (DSFO ¶¶ 122-124; PSOF ¶¶ 122-124), and the Central Office ultimately upheld the guilty finding (DSOF ¶ 125; PSOF ¶ 125).

## III.   Summary Judgment

A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).  But conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249;

1   <u>Devereaux</u>, 263 F.3d at 1076.

2       In assessing whether a party has met its burden, the court views the evidence in the

3   light most favorable to the non-moving party.  <u>Allen v. City of Los Angeles</u>, 66 F.3d 1052,

4   1056 (9th Cir. 1995).  If the evidence of the non-moving party is merely colorable or is not

5   significantly probative, summary judgment may be granted.  <u>Anderson</u>, 477 U.S. at 249-50.

6   **IV.    Plaintiff's Motions and Defendants' Objections**

7       The Court first addresses Plaintiff's Rule 56(d) Motion and Motion to Strike and

8   Defendants' objections submitted with their response to PSOF.

9       Federal Rule of Civil Procedure 56(d) provides that if judgment is not rendered on the

10  entire case on a summary judgment motion, a district court is to "specify[ ] what

11  facts—including items of damages or other relief—are not genuinely at issue."  Although

12  judgment is not rendered herein on the entire case, the Court finds that some of the 22 "Facts

13  Established" by Plaintiff in his Rule 56(d) Motion are disputed by the parties (Doc. #170).

14  This Order directs further proceedings in this action as necessary but, at this stage, it will not

15  adjudicate specific facts and deem them established.  Plaintiff's Rule 56(d) Motion will be

16  denied.

17

18      In their Response to PSOF, Defendants set forth objections to 24 of PSOF (Doc.

19  #175).  Theses objections are based primarily on the grounds that Plaintiff's statements lack

20  proper foundation, are based on hearsay, are conclusory, or are not based on personal

21  knowledge (<u>id.</u> at 1-5).  The Court has not relied on any facts that would be inadmissible at

22  trial in ruling on the summary judgment motion.  Therefore, to the extent that any of PSOF

23  lack proper foundation, lack personal knowledge, or are based on hearsay, Defendants'

24  objections are sustained; however, their objections are otherwise overruled.

25      Plaintiff's Motion to Strike Defendants' Response to PSOF will be denied as

26  unnecessary (Doc. #178).  The Court will consider Defendants' valid objections but, as set

27  forth *infra*, will not consider the new evidence submitted with Defendants' Response/Reply.

28

1    **V.    Count I—Placement in CB6**

2         Plaintiff's claim in Count I encompasses both a due process claim and a retaliation

3    claim.

4         **A.    Legal Standards**

5              ***1. Due Process***

6         A prisoner has no constitutional right to enjoy a particular security classification. <u>See</u>

7    <u>Meachum v. Fano</u>, 427 U.S. 215, 224-25 (1976) (no liberty interest protected by the Due

8    Process Clause is implicated in a prison's reclassification and transfer decisions). "As long

9    as the conditions or degree of confinement to which the prisoner is subjected is within the

10   sentence imposed upon him and is not otherwise violative of the Constitution, the Due

11   Process Clause does not in itself subject an inmate's treatment by prison authorities to

12   judicial oversight." <u>Montanye v. Haymes</u>, 427 U.S. 236, 242 (1976).  But some placements

13   in maximum security custody may implicate liberty interests requiring due process

14   protections.  <u>See</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 224 (2005).

15

16        In analyzing a due process claim, the Court must first decide whether a plaintiff was

17   entitled to any process, and if so, whether he was denied any constitutionally-required

18   procedural safeguard.  Liberty interests that entitle an inmate to due process are "generally

19   limited to freedom from restraint which, while not exceeding the sentence in such an

20   unexpected manner as to give rise to protection by the Due Process Clause of its own force,

21   nonetheless imposes atypical and significant hardship on the inmate in relation to the

22   ordinary incidents of prison life."  <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995) (internal

23   citations omitted).  Whether an inmate is entitled to the procedural protections afforded by

24   the Due Process Clause turns on the particular restrictions imposed and whether they "present

25   the type of atypical, significant deprivation in which a state might conceivably create a

26   liberty interest."  <u>Id.</u> at 486.

27        To determine whether the sanctions are atypical and significant hardships, courts look

28

to the prisoner's conditions of confinement, the duration of the sanction, and whether the sanction will affect the duration of the prisoner's sentence. <u>See</u> <u>Keenan v. Hall</u>, 83 F.3d 1083, 1088-89 (9th Cir. 1996). "Atypicality" requires not merely an empirical comparison but turns on the importance of the right taken away from the prisoner. <u>See</u> <u>Carlo v. City of Chino</u>, 105 F.3d 493, 499 (9th Cir.1997); <u>see e.g.</u>, <u>Sandin</u>, 515 U.S. at 472 (30 days disciplinary segregation is not atypical and significant); <u>Torres v. Fauver</u>, 292 F.3d 141, 151 (3rd Cir. 2002) (four months in administrative segregation is not atypical and significant); <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706-708 (3rd Cir. 1997) (fifteen months administrative segregation is not atypical and significant); <u>Jones v. Baker</u>, 155 F.3d 810, 812-13 (6th Cir. 1998) (two and one-half years of administrative segregation is not atypical and significant).

### 2. Retaliation

Prisoners have a constitutionally-protected right to file grievances and to pursue civil rights litigation without retaliation. <u>Rhodes v. Robinson</u>, 408 F.3d 599, 567 (9th Cir. 2005). A viable claim of First Amendment retaliation contains five elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) the action did not reasonably advance a legitimate correctional goal. <u>Rhodes v.</u> , 408 F.3d at 567-68; <u>see also</u> <u>Hines v. Gomez</u>, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claims require an inmate to show that (1) the prison official acted in retaliation for the exercise of a constitutionally-protected right and (2) the action "advanced no legitimate penological interest").

Retaliation claims must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. <u>Pratt v. Rowland</u>, 65 F.3d 802, 807

1   (9th Cir. 1995.)

2       **B.    Parties' Contentions**

3       Defendants argue that Plaintiff's placement in CB6 did not result in the imposition of

4   an extraordinary, atypical and significant hardship (Doc. #158 at 3-4).  They argue that

5   Plaintiff has failed to describe the conditions in CB6; he merely complains that it is a super-

6   max facility and he should not have been housed there.  They contend that temporary

7   placement in administrative detention does not rise to a constitutional claim nor does Plaintiff

8   have a right to a particular classification status (id. at 4, citing Hewitt v. Helm, 459 U.S. 460,

9   468 (1983) and Hernandez v. Johnson, 833 F.2d 1316, 1318 (9th Cir. 1987)).

10      Defendants further contend that Schriro was not even employed with ADC at the time

11  Plaintiff was transferred to CB6; thus, she cannot be personally liable for the transfer (Doc.

12  #158 at 3).  They maintain that Plaintiff has not shown that upon her arrival at ADC, Schriro

13  was aware of the transfer or that the transfer was pursuant to an unlawful policy or practice

14  (id.).  And Defendants submit that there were legitimate penological reasons for Plaintiff's

15  transfer and placement at CB6, which were undertaken as part of a regular classification and

16  placement review (Doc. #174 at 3).

17

18      Although he did not provide any allegations regarding the conditions at CB6 in his

19  First Amended Complaint, in his opposition to summary judgment, Plaintiff claims that the

20  conditions were "draconian"; lights were dimmed at night but on 24 hours a day, recreation

21  and showers were sporadic, there was limited human contact, and the food was reduced (Doc.

22  #172 at 2; Doc. #171, Ex. A, Pl. Decl. ¶ 8).  He asserts that he was never provided with

23  notification or a reason why he was transferred to CB6, either before or after his confinement

24  there (Doc. #172 at 2).

25      In support of his retaliation claim, Plaintiff points to Defendants' assertion that

26  because Plaintiff received a disciplinary report before his transfer, there were grounds to

27  transfer him to CB6 pending an investigation (id. at 9, citing DSOF ¶ 2).  He also relies on

28

Schriro's interrogatory responses, which include her statement that Plaintiff was moved to CB6 because of a disciplinary ticket issued at the Texas facility on June 4 (Doc. #171, Ex. A, Ex. 4 ¶ 13).  Plaintiff explains that this disciplinary ticket was dismissed two weeks before his transfer and asserts that it cannot justify his placement in CB6 (id., Ex. A, Pl. Decl. ¶ 5). He alleges that the Texas Warden told him that Schriro ordered the transfer, and he argues that it can reasonably be inferred that his transfer was in retaliation for Plaintiff filing numerous Complaints and adding Schriro as a Defendant in a pending lawsuit (Doc. #172 at 9).  Plaintiff asserts that the timing of his transfer, so near to the filing of his lawsuit, further supports the inference that his transfer was retaliatory (id. at 9, 11).

As to Schriro's liability, Plaintiff confirms that he is suing her in her official capacity, so whether or not she was at ADC when he was transferred to CB6 is immaterial (id. at 4). Plaintiff alleges that ADC policy provides that any placement in detention or maximum security housing must be accompanied by notice of the pending placement and a chance to appeal it; because these safeguards were not provided to him, he argues that he has a valid official-capacity claim against Schriro (id.).  In another section of his response memorandum, Plaintiff argues that Schriro is the only one who could have had him transferred from Texas to CB6, that she initiated the transfer, and that she failed to remedy the wrong against him (id. at 11).

## C.    Analysis

The Court will first address the due process claim.  This requires to the Court to determine whether Plaintiff was entitled to any due process prior to his placement in CB6. As stated, this analysis looks at whether the particular restrictions imposed presented an atypical and significant deprivation.  Sandin, 515 U.S. at 486.

Defendants submit evidence showing that Plaintiff was housed in CB6 from June 17 to July 28, 2008—almost 40 days (Doc. #159, Ex. C, Perow Decl. ¶¶ 10, 23, Attach. 1 (Pl.'s Adult Information Management System (AIMS) report)).   Taking as true Plaintiff's

allegations in his response and declaration, the conditions in CB6 included limited human contact, limited showers and recreation, and constant lighting.  Notably, Plaintiff does not allege that he was completely denied showers, recreation, or human contact.  The Court finds that confinement in these conditions for 40 days does not rise to an atypical and significant hardship.  See Sandin, 515 U.S. at 472.  Therefore, the conditions in CB6 did not implicate a liberty interest, and Plaintiff was not entitled to specific procedures under the Due Process Clause or under ADC policy DI-67, before his transfer.

Moreover, as mentioned, Plaintiff does not have a constitutional right to a particular cell assignment or security classification.  See Hernandez, 833 F.2d at 1318; Meachum, 427 U.S. at 224-25.  Nor is the Due Process Clause implicated when prison officials transfer a prisoner, even if the conditions at the new facility are "more disagreeable."  Meachum, 427 U.S. at 225.  As long as the conditions do not otherwise violate the constitution, a prisoner is not entitled to constitutional procedural protections.  Because the Court finds that the CB6 conditions did not offend the constitution, Plaintiff's due process claim fails.

Next, the Court examines the retaliation claim.  Plaintiff maintains that the timing of his transfer following his lawsuit raises a material question as to whether the transfer was retaliatory.  Retaliatory motive can be inferred from the timing and nature of events.  Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995); Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1316 (9th Cir. 1989).  Plaintiff does not dispute, however, that Schriro did not begin her employment until July 1, 2003—more than two weeks *after* Plaintiff's transfer to CB6 (Doc. #171, PSOF ¶ 1).  Thus, Plaintiff's unsupported claims that she directed a retaliatory transfer must fail.

Plaintiff's claims regarding Schriro's liability are contradictory; Plaintiff asserts that she is sued only in her official capacity, but then he alleges a personal-capacity claim—that only she could have orchestrated his transfer and she did so in retaliation for his lawsuit.  As to whether she was personally put on notice of and disregarded an on-going violation as a

result of Plaintiff's grievances, this claim must also fail.  As set forth above, neither Plaintiff's transfer nor the conditions-of-confinement in CB6 raised constitutional concerns. And Plaintiff's official-capacity claim, which would imply that an unconstitutional policy or practice led to a deprivation, is not supported by Plaintiff's allegations because he alleges that his transfer was contrary to policy; not that the policy itself was violative (see Doc. #172 at 4).

On this record, there exists no genuine issue of material fact that Plaintiff was unlawfully denied due process or subject to retaliation upon his transfer and placement in CB6.  Summary judgment will be granted on Count I.

**VI.    Count III—Threat to Safety in Shower Placement**

**A.    Legal Standard**

A prisoner's claim for unconstitutional conditions of confinement arises under the Eighth Amendment's prohibition against cruel and unusual punishment. Bell v. Wolfish, 441 U.S. 520 (1979).  To state a claim for unconstitutional conditions of confinement, a plaintiff must allege that a defendant's acts or omissions have deprived the inmate of "the minimal civilized measure of life's necessities" and that the defendant acted with deliberate indifference to an excessive risk to inmate health or safety.  Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049-50 (9th Cir. 2002).  That is, a plaintiff must allege a constitutional deprivation that is objectively "sufficiently serious" to result in the denial of "the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834.

"[T]he Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981). Although prison conditions may be restrictive, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. See id. at 347-48; Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).  Subjecting a prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain

that violates the Eighth Amendment.  See Anderson v. County of Kern, 45 F.3d 1310, 1314 (9th Cir. 1995).  In Anderson, the Ninth Circuit recognized circumstances that would constitute violations of the Eighth Amendment, including (1) placing a naked inmate in a lice-infected cell, serving him dirty food, and leaving his head in excrement while having a seizure, Gee v. Estes, 829 F.2d 1005, 1006 (10th Cir. 1987); (2) placing a naked inmate in a bare, concrete cell with excrement-encrusted pit toilet and no washing facilities or hygiene products for 48 hours as punishment for setting fire to his cell, McCray v. Burrell, 516 F.2d 357, 366-69 (4th Cir. 1974); and (3) confining an inmate for five days in a strip cell with only a pit toilet and without a sink or other washing facilities, LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972).  Anderson, 45 F.3d at 1314-15.

If a plaintiff demonstrates a deprivation that is objectively "sufficiently serious," he must then allege facts supporting that the prison official had a "sufficiently culpable state of mind," i.e., that the official acted with deliberate indifference to inmate health or safety. Farmer, 511 U.S. at 834.  In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test; "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  "'The circumstances, nature, and duration of a deprivation of [ ] necessities must be considered in determining whether a constitutional violation has occurred.'" Hearns v. Terhune, 413 F.3d 1036, 1042 (9th Cir. 2005) (quoting Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000)).

### B.    Parties' Contentions

Defendants contend that Plaintiff's temporary placement in the shower room did not rise to an atypical and significant hardship because the conditions did not pose an intolerable risk of serious harm (id.).  They further contend that Massey and Klein directed staff to attend to Plaintiff's personal needs and that Plaintiff failed to alert anyone that his basic needs were not met; therefore, Massey and Klein were unaware there may have been a

substantial risk of harm (id. at 6-8).  Finally, Defendants argue that despite his assertions that he became ill, Plaintiff has not disclosed any probative evidence to support those assertions (id. at 6).

Klein states that when Plaintiff was placed in the shower, "arrangements were made to meet [Plaintiff's] basic needs for water, food, and restroom access" (id., Ex. E, Klein Decl. ¶ 5).  Klein recalls that he instructed staff to provide water and restroom needs to Plaintiff hourly—he believes that he gave these instructions in front of the shower room (id. ¶ 14). Klein does not recall Plaintiff making any complaints about the shower placement "either directly or indirectly" (id. ¶¶ 12, 18), nor does Klein recall how long inmates are customarily housed in the shower rooms or if he saw Plaintiff in the shower room after his initial placement there (id. ¶¶ 15, 17).  Klein states that he monitored the length of time inmates were assigned to the shower rooms by reviewing the Individual Detention Records, or "Pod" sheets, which were forwarded to him for review so he could ensure that the proper services were provided (id. ¶ 16).  Klein avers that "[a]t a minimum, [Plaintiff] would have been offered water and toilet use during hourly security checks" (id. ¶ 13).  Klein states that inmates are no longer housed in the showers (id. ¶ 19).

In her affidavit, Massey avers that she was present when Plaintiff was placed in the shower room (Doc. #159, Ex. D, Massey Aff. ¶ 24).  She attests that she directed correctional officers to provide water to Plaintiff and allow him to use the toilet during hourly security checks and to "document what they did in this regard" (id. ¶ 25).  Massey understood that Plaintiff would eat his meals in the shower room (id. ¶ 26).  Massey attests that after his initial placement in the shower, she does not recall having any further interactions with Plaintiff or whether she was apprised by staff of any complaints he made about the placement (id. ¶ 27).  She also attests that she was not "immediately aware" of the IMS that was initiated after his fall in the shower (id. ¶ 33), but, regardless, even if Plaintiff had made any complaints to her, she was not authorized to move him "without the approval of my chain-of-

command" (id. ¶ 32).

Plaintiff declares that while in the shower, he had to defecate in the corner and urinate in the drain (Doc. #171, Ex. A, Pl. Decl. ¶ 16).  He further declares that he was not given any water and his requests for access to the toilet were denied (id.).  He had to eat his meals in the shower and he was not given a spoon, so he had to use his hands to eat his food (id.).  Plaintiff states that there was water that accumulated on the concrete floor and he had to lie in the water (id.).  Also, he was not given any bedding (id. ¶ 20).  And he avers that there were bugs in the shower (id. ¶ 19).  Plaintiff states that his requests for cleaning supplies were denied (id.).  He explains that it was filthy, and the smell was unbearable (id. ¶ 18).  At one point, Plaintiff became sick and had to vomit in the drain (id. ¶ 19).  He declares he then passed-out, hit his head, and urinated on himself (id.).  He woke up to medical staff checking on him (id.).  But Plaintiff remained in the shower after this incident (id.).  Plaintiff's evidence shows that this medical incident in the shower occurred on May 27, and that he was left in the shower afterwards (id., Ex. 12, ¶¶ 9, 16).

Plaintiff argues that Massey and Klein were aware of the conditions in the shower, which posed a serious risk of harm, yet they placed him in the shower anyway (Doc. #172 at 5).  And he contends that Schriro allowed this gross violation to continue (id. at 13).  He points to Klein's admission that at the time, it was not unusual to house inmates in the showers (id.).  Further, Plaintiff asserts that he grieved the incident through to Schriro, and his family called and wrote to her to complain; however, she took no measures to stop the practice (id. at 13).

**C.   Analysis**

First, the Court looks at the objective prong of the deliberate indifference standard; whether the conditions of confinement in the shower were objectively sufficiently serious.  Taking Plaintiff's facts as true, which the Court must do on summary judgment, the conditions in the shower were deplorable.  Even though Plaintiff's confinement there was

just three days, the conditions he was subjected to approach those identified in <u>Anderson</u> that were found to be violative of the Eighth Amendment, even for short periods. Plaintiff's confinement in a shower with no bedding, toilet, sink, or cleaning supplies, and conditions that led Plaintiff to pass out yet still be left in the shower, establishes deprivations sufficiently serious to satisfy the objective component of an Eighth Amendment claim of cruel and unusual punishment.

Next, the Court turns to the subjective prong of the analysis, which looks at Defendants' state of mind. Prison officials act with the requisite culpable intent when they act with deliberate indifference to an inmate's suffering. <u>Anderson</u>, 45 F.3d at 1313. Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk. <u>Farmer</u>, 511 U.S. at 844-45.

### 1. *Schriro*

Defendants do not address Schriro's liability as to Count III. Their arguments go only to the liability of Klein and Massey (<u>see</u> Doc. #158 at 5-10; Doc. #174 at 4-6). Plaintiff alleges that Schriro allowed the conduct that led to constitutional deprivations (Doc. #172 at 13). He points to Klein's interrogatory response in which Klein stated that it was ADC practice to house inmates in the shower (<u>id.</u>, citing Doc. #171, Ex. A, Ex. 14 ¶ 9). Plaintiff also asserts that his family put Schriro on notice of the shower situation but she did nothing in response to the official's conduct (Doc. #172 at 13).

Plaintiff's evidence includes Schriro's interrogatory and admission responses (Doc. #171, Ex. A, Exs. 4, 15). Despite Klein's statement that showers were sometimes used to house inmates (<u>id.</u>, Ex. A, Ex. 14 ¶ 9), Schriro states that showers are rarely used as emergency housing locations and inmates are not to be housed there as punishment (<u>id.</u>, Ex. A, Ex. 4 ¶ 9). Schriro admitted that Plaintiff grieved his shower placement up to the director (<u>id.</u>, Ex. A, Ex. 15 ¶ 7). The record shows that Plaintiff appealed this issue to the director on

July 7, 2004, and the deputy director for Schriro responded to the appeal on January 21, 2007 (id., Ex. A, Ex. 20).

Although the response to Plaintiff's director's appeal is dated well after the appeal was filed, there is no evidence suggesting that Schriro was aware of the issue raised in Plaintiff's appeal until it was addressed by her staff. The evidence reflects that it was Klein's practice to house inmates in the shower, not Schriro's. And there is no evidence of an ADC policy to house inmates in the shower. At most, Schriro conceded that on rare occasions inmates may be placed in showers. But placement in a shower does not by itself amount to a constitutional violation. There is nothing to suggest that Schriro knew of and disregarded the risks Plaintiff faced during his confinement in the shower in May 2004. On this record, Plaintiff cannot support his allegations that Schriro is liable either personally or due to a policy or practice. See Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (conclusory allegations concerning the involvement of an official in civil rights violations are insufficient to establish liability). Indeed, in his deposition, Plaintiff conceded that there is no evidence that Schriro was aware of the treatment he received during the shower incident (Doc. #159, Ex. G, Pl. Dep. 35:14-20). Because there is no genuine issue of material fact that Schriro was liable for Plaintiff's suffering caused by the conditions in the shower, she will be granted summary judgment on Plaintiff's Eighth Amendment claim in Count III.

### 2. Klein

Defendants argue that Plaintiff cannot show that Klein was aware of facts indicating that a substantial risk of harm existed and that he drew the inference that it did (Doc. #158 at 8).

Defendants submit Klein's declaration, but most of his averments are not competent evidence. He states that he does not recall whether he saw Plaintiff after placement in the shower or whether Plaintiff made any complaints (Doc. #159, Ex. E, Klein Decl. ¶¶ 12,17-18). Failure to remember factual information, like having a "belief" in factual information,

1    is insufficient to show a material factual dispute because it does not show personal

2    knowledge.  See Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1412-13 (9th Cir. 1995)

3    (declaration on information and belief are entitled to no weight where declarant lacks

4    personal knowledge).

5           Those averments from Klein that may be considered on summary judgment include

6    statements regarding his job responsibilities.  He states that he placed inmates in the showers

7    on many occasions (Doc. #159, Ex. E, Klein Decl. ¶ 19), and when he did, he monitored the

8    amount of time inmates spent in the shower rooms by reviewing the Individual Detention

9    Records, or "Pod" sheets (id. ¶ 16).  Defendants argue that these "Pod" sheets—which were

10   submitted with Defendants' Response/Reply to PSOF—indicate that, pursuant to Klein's

11   instructions, Plaintiff's basic needs were provided for (Doc. #175 at 5).  Thus, Klein could

12   not have been aware that Plaintiff was subject to the conditions he claims to have

13   experienced (Doc. #174 at 5).

14

15          Because the relevant "Pod" sheets were proffered with Defendants' reply filings,

16   Plaintiff did not have an opportunity to respond to this evidence.  "Where new evidence is

17   presented in a reply to a motion for summary judgment, the district court should not consider

18   the new evidence without giving the [non-]movant an opportunity to respond."  Provenz v.

19   Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (citing Black v. TIC Inv. Corp., 900 F.2d 112,

20   116 (7th Cir. 1990)).  Plaintiff was not given an opportunity to respond; thus, the Court may

21   not consider these "Pod" sheets.  Regardless, Klein's sole averment about the "Pod" sheets

22   is a general statement about his responsibility to monitor inmates in showers:

23          I monitored the length of time inmates were assigned to the shower rooms
           from review of the Individual Detention Records ("Pod" sheets) which were
24         customarily completed regarding the activities of each inmate in detention.
           The pod sheets for inmates housed in the showers were forwarded to me for
25         review, so I could ensure that they were being provided the required services.
           I believe that the top of the pod sheet indicated the day the individual was
26         placed in his current housing (Doc. #159, Ex. E, Klein Decl. ¶ 16).

27

28   Klein does not reference the "Pod" sheets specific to Plaintiff's detention, nor does Klein

assert that he reviewed or relied on the "Pod" sheets to monitor Plaintiff's confinement.

In sum, Defendants do not dispute that Klein placed Plaintiff in the shower (Doc. #171, Ex, A, Ex. 14 ¶ 6; Ex. 12 at 12). Thus, Klein would have observed the conditions and lack of facilities in the shower and seen that Plaintiff had no bedding. The evidence demonstrates that Klein was to ensure that inmates housed in showers received the "required services." Yet Plaintiff avers that he was denied basic necessities and forced to remain in the shower despite passing out after getting sick and vomiting in the drain. This is sufficient to create a triable issue of fact whether Klein was deliberately indifferent to Plaintiff's suffering. Summary judgment as to Klein on Count III will be denied.

### 3. Massey

Defendants present the same argument regarding Massey's liability—that Plaintiff cannot show Massey was aware of facts indicating that a substantial risk of harm existed and that she drew the inference that it did (Doc. #158 at 8).

Massey attests that she accompanied Plaintiff to the shower room and that she instructed staff to provide water and toilet access to Plaintiff (Doc. #159, Ex. D, Massey Aff. ¶¶ 24-25). Like Klein, Massey attests that she does not recall interacting with Plaintiff after he was placed in the shower or whether she knew about Plaintiff's complaints (id. ¶ 27). As stated, affidavit statements that Massey does not "recall" things do not demonstrate personal knowledge.

With regard to whether Massey was aware of the shower conditions, it is undisputed that Massey was present when Plaintiff was placed in the shower; therefore, she would have known that he had no bedding. In her response to admissions, Massey admits that the shower did not have a bed, toilet, sink, or table (Doc. #171, Ex. A, Ex. 8, ¶ 10). Massey also admits that Plaintiff was given his food in the shower, and that her admission is "based upon her personal observation" as well as a review of the meal logs (id. ¶ 9). And Massey avers that as Sergeant, she supervised and maintained secure operation of the detention unit where the

- 24 -

shower room was located (Doc. #159, Ex. D, Massey Aff. ¶ 3).

In response to Massey's assertion that she did not have the authority to move Plaintiff, Plaintiff declares that he was ultimately removed from the shower by CO IV Scott, who is below Massey in the chain of command (Doc. #171, Ex. A, Pl. Decl. ¶ 15).  Defendants object on the ground that Plaintiff lacks personal knowledge of Massey's authority (Doc. #175 at 3).  But even if Massey lacked authority to move Plaintiff, she is liable if she was aware of a risk of harm to Plaintiff and did nothing in response.  "[T]urning a blind eye to the relevant surrounding facts will not shield a prison official from liability."  Swan v. United States of America, 159 F. Supp.2d 1174, 1182 (N.D.Cal. 2001); see Farmer, 511 U.S. at 843 n. 8.

Given Massey's responsibilities as Sergeant, her knowledge of the shower conditions, and her statement that she personally observed Plaintiff during his detention in the shower, there is a question of material fact whether Massey was aware of a substantial risk of harm to Plaintiff posed by the conditions in the shower and whether she disregarded that risk.  Consequently, summary judgment will be denied to Massey on Count III.

### 4. Qualified Immunity

Klein and Massey claim that they are entitled to qualified immunity on Count III.  If a defendant claims qualified immunity, the court must make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry."  See Estate of Ford, 301 F.3d at 1049.  The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The "qualified immunity inquiry" asks if the right was clearly established at the relevant time.  Id. at 201-02.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id. at 201.  In Pearson v. Callahan, the Supreme Court held that the Saucier procedure is not an inflexible requirement; judges "should be permitted to exercise

their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. 808, 811, 818 (Jan. 21, 2009).  In this case, the Court finds no reason to deviate from Saucier's traditional analysis.

With respect to the first step, as discussed *supra*, the Court has determined that disputed facts, viewed in the light most favorable to Plaintiff, create a triable issue of fact regarding whether Klein and Massey were deliberately indifferent to a substantial risk to Plaintiff.  The second step of the Saucier analysis requires Defendants to demonstrate that their conduct did not violate clearly established constitutional law.  Saucier, 533 U.S. at 201.

Defendants assert Plaintiff cannot show that his placement in the shower room violated his constitutional rights because Klein and Massey directed staff to provide him with basic needs and "reasonable officials in [their] positions would not have been on clear notice that their decision to house him there would violate his constitutional rights" (Doc. #158 at 9-10).  Defendants argue that Klein and Massey could have reasonably considered the facts but concluded that the risk was insubstantial, and it would not have been clear when that insubstantial risk changed to a substantial risk of serious harm, given the circumstances—a crowded detention unit (id. at 10).  Thus, they maintain that the law did not put Klein or Massey on notice that placing Plaintiff in the shower was unlawful (id. at 11).

Defendants' argument that there was no constitutional violation implicates the same genuine issues of material fact addressed in the first prong of the qualified immunity analysis.  When resolved in Plaintiff's favor, those facts demonstrate a deprivation under the Eighth Amendment—a deprivation that would have been clear to a reasonable official, even one working in a crowded detention unit.  See Anderson, 45 F.3d at 1314; Hoptowit, 682 F.2d at 1246 (9th Cir. 1982).  Thus, Defendants fail to pass the second prong of the Saucier test, and qualified immunity will be denied.  See Martinez v. Stanford, 323 F.3d 1178, 1184-85 (9th Cir. 2003) (the factual dispute bearing on the question of qualified immunity made

summary judgment on that ground inappropriate).  Santos v. Gates, 287 F.3d 846, 855 n. 12 (9th Cir. 2002) (declining to grant qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom" (citation omitted)).

## VII.  Count VI - Denial of Due Process in Disciplinary Proceedings

### A.  Legal Standard

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  Procedural due process safeguards in a prison disciplinary hearing require that the prisoner receive: (1) written notice of the charges, no less than twenty-four hours prior to the hearing; (2) a written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action; and (3) a limited right to call witnesses and present documentary evidence when it would not be unduly hazardous to institutional safety or correctional goals to allow the prisoner to do so.  Id. at 565-66.

Once these Wolff procedural protections are followed, the only function of a federal court is to review the statement of evidence upon which the committee relied in making its findings to determine if the decision is supported by some facts.  The Supreme Court has defined the quantum of evidence necessary to satisfy due process in a prison disciplinary decision.  Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1984).  "The requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board . . . ." Id.  The Court reasoned that since the consequence of a prison disciplinary hearing, such as the revocation of good time credits, was not comparable to a criminal conviction, due process did not require courts to set aside disciplinary decisions that have some basis in fact.  Id. at 456.  A court's review under this standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." Id. at 455; Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir.

1    1987).

2        **B.      Parties' Contentions**

3        Defendants argue that the right to call witnesses at a disciplinary hearing is a qualified

4    right, subject to the operational interests of prison officials  (Doc. #158 at 12).  They state

5    that Plaintiff's requested inmate witnesses were not called because they were located at

6    different prison complexes and transporting them would have presented security concerns

7    (id. at 13).  And because CO IV Scott, the officer-witness Plaintiff requested, was not present

8    at the time of the events relating to the charge, she was not called (id.).

9        Plaintiff contends that the denial of witnesses and the denial of staff assistance

10   violated his procedural due process rights (Doc. #172 at 5).  He also argues that Defendants

11   failed to comply with the applicable time lines established for the hearing procedures (id. 17).

12   According to Plaintiff, a prisoner must receive delivery of the charge against him within 7

13   days from the date of the violation and the disciplinary hearing must be held 7 days after

14   delivery of the charge (id.).  He submits that postponement of the hearing is allowed only

15   once for 7 days (id.).  Plaintiff notes that he did not receive notice of the charges against him

16   until 22 days after the date of the violation and the hearings were not held until 34 days after

17   the delivery of the notices (id.).

18

19       Plaintiff argues that at the hearings, Carroll informed him that she would believe an

20   officer over an inmate, and that the sanctions/ hearing form was completed before Plaintiff

21   entered the room, indicating the determination was made before the hearing (id.).

22       Plaintiff further argues that his situation is similar to that in Johnson v. Finnan, where

23   the Seventh Circuit addressed a prisoner's claim that he requested staff testimony and a copy

24   of  a videotape and the disciplinary board's counter-claim that the prisoner did not seek to

25   present any evidence (id., citing 467 F.3d 693 (9th Cir. 2006)).  The Court found that even

26   though a disciplinary board may resolve factual disputes on "some evidence," they cannot

27   prevent a prisoner from offering material evidence.  Thus, if the prisoner's claims were

28

1   correct, he was prevented from offering evidence.  Johnson, 467 F.3d at 694.  Plaintiff
2   submits that Defendants' claim that his witness were at other facilities is not a valid reason
3   to deny their appearance (Doc. #172 at 17).

4         **C.**   **Analysis**

5         At issue in Count VI is whether the denial of staff assistance, the denial of witnesses,
6   and the failure to abide by the time frames outlined in the ADC policy, violated Plaintiff's
7   due process rights.

8         Under Wolff, an inmate should be provided aid from a fellow inmate or from prison
9   officials if the inmate is illiterate or if the complexity of the issues makes it difficult for the
10  inmate to collect and present evidence or comprehend the case.  418 U.S. at 570.  That is not
11  the case here.  Plaintiff is literate and was fully able to comprehend and defend the basic
12  charges against him.  As such, the denial of staff assistance does not violate the Due Process
13  Clause.

14        The decision whether to allow witnesses in a disciplinary hearing must be made on
15  a case-by-case basis.  Mitchell v. Dupnik, 75 F.3d 517, 525 (9th Cir. 1995).  "[A] blanket
16  denial of permission for an inmate to have witnesses physically present during disciplinary
17  hearings is impermissible, even where jail authorities provide for interviewing of witnesses
18  outside the disciplinary procedure."  Id.

19        Here, the record reflects that the decision to deny witnesses was made specific to
20  Plaintiff's case.  The inmate witnesses were deemed to pose a security risk since they were
21  housed at different facilities and would have required transport for the hearing.  And the
22  officer witness was not immediately denied; rather, the disciplinary coordinator interviewed
23  CO IV Scott and posed questions written by Plaintiff (Doc. #159, Ex. F, Attach. 2 at 4).
24  Carroll determined from the disciplinary coordinator's investigation that Scott was not
25  present during the incident and only then denied the witness (id., Ex. F, Carroll Aff. ¶ 17).
26  On this record, the decision to deny witnesses at the hearing was within the discretion of

prison officials, and the grounds for denying witnesses was based on the circumstances in the case and documented by officials at the time (id., Ex. F, Attach. 2 at 6).   This distinguishes Plaintiff's case from Johnson, where the state defendants did not proffer any reason for denying a witness at the prisoner-plaintiff's hearing.   467 F.3d at 694.   In the instant action, the denial of witnesses did not offend the Due Process Clause.

The Due Process Clause requires only those procedures mandated by Wolff; it does not require that prisons comply with their own, more generous procedures.   See Walker v. Sumner, 14 F.3d 1415, 1419-20 (9th Cir. 1994), abrogated on other grounds by Sandin, 515 U.S. 472.   Therefore, Defendants' failure to comply with the time lines set forth in their own policy does not violate due process, unless that failure resulted in process insufficient to meet the Wolff standard.   Wolff requires that an inmate must be given "at least a brief period of time after the notice" of a charge before appearance in a disciplinary hearing.   418 U.S. at 564.

The ADC policy provides that hearings may be postponed for good cause, and in both of Plaintiff's disciplinary cases, the postponements were approved (Doc. #159, Ex. F, Attach. 1, § 6.10.6; Attach. 2 at 2, 5; Attach. 3 at 2, 4).   As to Plaintiff's claim that notice of the charge against him was delivered well after the incident giving rise to the charge, it does not appear that the policy sets a time in which notice of the charge must be delivered. Regardless, even if there was a violation of the policy, it would not constitute a due process violation unless the Wolff requirements were also violated.   The Court finds that the Wolff requirements were met in Plaintiff's case.   Consequently, summary judgment will be granted on Plaintiff's due process claim in Count VI.   Because Carroll is named only in Count VI, he will be dismissed as a Defendant.

**IT IS ORDERED:**

(1) The Clerk of Court is directed to change the name of Defendant Carlin to "Massey" on the docket.

(2) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. #158), Plaintiff's Rule 56(d) Motion (Doc. #169), and Plaintiff's Motion to Strike (Doc. #178).

(3) Plaintiff's Rule 56(d) Motion (Doc. #169) and Motion to Strike (Doc. #178) are **denied**.

(4) Defendants' Motion for Summary Judgment (Doc. #158) is **granted** in part and **denied** in part as follows:

(a) the motion is **granted** as to Count I;

(b) the motion is **granted** as to Count VI;

(c) the motion is **granted** as to Defendant Schriro in Count III;

(d) the motion is **denied** as to Defendants Klein and Massey in Count III.

(5) The Clerk of Court must dismiss Counts I and VI and Defendants Carroll and Schriro.

(6) The remaining claim is Count III against Defendants Klein and Massey.

DATED this 20th day of March, 2009.

Mary H. Murguia
United States District Judge